IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No. 04-cv-02631 WYD

CARRIE BUZBY,

     Plaintiff,

v.

METROPOLITAN LIFE INSURANCE COMPANY, a/k/a MET LIFE; and
INTERNATIONAL BUSINESS MACHINES CORPORATION, a/k/a IBM,

     Defendants.

---

## FINAL ORDER ON REVIEW OF ADMINISTRATIVE RECORD

---

     This is a case arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Plaintiff Carrie Buzby claims that Defendant Metropolitan life Insurance Company ("Met Life") violated ERISA when it issued its final determination letter dated April 15, 2004, upholding its earlier decision in a letter dated July 15, 2003, to deny continued payment of long-term disability benefits to plaintiff pursuant to a long-term disability policy issued by defendant.

     Plaintiff asks this Court to find that Met Life's determination was arbitrary and capricious, to order Met Life to reinstate her benefits, less any overpayments due to her receipt of Social Security Disability Income ("SSDI"), and to award interest on back due amounts and attorneys' fees and costs.[1] Met Life urges the Court to affirm its decision

---

[1] Plaintiff's complaint alleges a Second Claim for Relief against Defendant International Business Machines ("IBM") for alleged wrongful denial of medical insurance benefits after the summer of 2004 (Complaint at ¶¶ 24-28). However, despite the fact that IBM filed an answer on January 31, 2005, there

denying benefits and dismiss plaintiff's claim, and pursuant to its counterclaim, award it amounts that it has allegedly "overpaid" due to plaintiff's receipt of SSDI benefits.

# I. PROCEDURAL BACKGROUND

As of July 2001, plaintiff was employed at IBM, apparently as a clerical worker, and was a participant in a long-term disability benefits plan ("Plan") as to which Met Life acted as both the claims administrator and insurer of claims.[2] The undisputed facts show that plaintiff first made a claim for disability benefits on July 31, 2001 (AR 111, 151).[3] Total disability, as defined in the Plan, means that during the first 12 months [after completing a waiting period], the participant cannot perform the important duties of her regular occupation with IBM because of a sickness or injury (AR 19). After a participant has received disability benefits for twelve months, the Plan defines totally disabled as meaning that the participant, because of sickness or injury, cannot perform the important duties of her "occupation or of any other gainful occupation" for which the participant is reasonably fit by reason of education, training or experience. *Id.*

The policy definition also requires that the participant be "under the appropriate care and treatment of a doctor on a continuing basis." *Id.* It also provides that in applying for disability, the participant, at her own expense, must submit "proof of disability satisfactory to [Met Life]." *Id.*

---

do not appear to have been any further proceedings against IBM. The Court has no briefing before it pertaining to that claim, and therefore does not reach that claim at this time.

[2] *See* Met Life's Brief at 12.

[3] The Administrative Record in this case consists of 784 pages contained in two volumes, with Volume 1 containing pages 1-354 and Volume 2 containing pages 355-784. The Court will refer to the record by the designation AR without reference to the volume.

By letter dated September 4, 2001, Met Life informed plaintiff it denied her claim due to the fact that she had returned to work and her waiting period had not expired (AR 153). Between October 15, 2001 and January 3, 2002, plaintiff continued to work at IBM, but not on a full-time basis. Met Life's internal notes show that on January 3, 2002, IBM informed Met Life that plaintiff could work three days per week for 8 hours per day (AR 114). The internal notes also reflect that on January 3, 2002, Met Life approved plaintiff's claim of disability from her regular occupation based on a diagnosis of "fibromyalgia."[4] AR 115. By letter dated January 7, 2002, Met Life informed plaintiff that it had approved her claim for long-term disability benefits with an effective date of December 3, 2001, although the letter, unlike the internal notes, does not specify the condition on which the disability was based (AR 171-72). The letter also informed plaintiff that under the terms of the Plan the definition of disability changes from an "own occupation" to an "any occupation" definition effective after twelve months, or on December 3, 2002. *Id.*

The Plan provides that the benefits payable under the Plan will be reduced by actual or estimated primary SSDI benefits paid to plaintiff by reason of the disability. However, the Plan also provides that eligibility for payment of SSDI does not guarantee benefits under the Plan. A participant may avoid reduction of Plan benefits by the

---

[4] According to the Mayo Clinic medical website, fibromyalgia is defined as "a chronic condition characterized by widespread pain in [the] muscles, ligaments and tendons, as well as fatigue and multiple tender points." The condition can be diagnosed more or less objectively by examining for pain in 18 trigger points on the body. *Meraou v. Williams Co. Long Term Disability Plan*, No. 06-5051, 2007 WL 431515 at *8 (10th Cir. 2007). The American College of Rheumatology has established general classification guidelines for fibromyalgia, to help in the assessment the condition. According to these guidelines, to be diagnosed with fibromyalgia a patient must have experienced widespread aching pain for at least three months and have a minimum of 11 locations on the body that are abnormally tender under relatively mild, firm pressure. http://www.mayoclinic.com/health/fibromyalgia/DS00079/DSECTION=9.

estimated SSDI benefits if she submits proof that she has applied for SSDI (*see* AR 19-23).  By letter dated January 28, 2002, Met Life informed plaintiff of the possibility of seeking SSDI benefits and provided her with the name of a law firm to contact if she so desired (AR 173-74).

By letter dated November 25, 2002, Met Life requested plaintiff to submit current medical information by December 20, 2002 in order to permit Met Life to determine her eligibility for disability benefits under the "any occupation" definition of total disability (AR 123, 202-03).  Plaintiff did not timely respond, and by letter dated January 7, 2003 Met Life advised plaintiff that it would terminate her benefits effective December 21, 2002 (AR 204-06).

Thereafter, plaintiff contacted Met Life, and provided an explanation of why she had been unable to meet the deadline.  On February 28, 2003, Met Life reviewed the status of plaintiff's claim and apparently, according to internal notes, decided to send plaintiff a letter establishing a deadline of March 28, 2003 for the submission of information supporting her claim (AR 124-25).  A letter dated March 28, 2003 is not found in the record.  Nonetheless, by letter dated April 12, 2003, plaintiff provided some information about her claim (AR 235-36), including a letter from Dr. Linda Peterson (AR 238-40), and stated she needed additional time to provide other materials.  On or about April 27, 2003, plaintiff submitted a letter from a Dr. David Grosser (AR 243) and a short memorandum from a Dr. Judy Weiss (AR 244).  On May 21, 2003 Met Life advised plaintiff that her files were "being reviewed by medical. " (AR 127).

By letter dated July 15, 2003, Met Life informed plaintiff that it was upholding the termination of her benefits, stating that the letters from Drs. Weiss and Grosser did not

indicate how often plaintiff was seen by physicians or provide any objective findings on physical exams or any prescribed treatment (AR 249-51). The letter advised plaintiff that she had 180 days to appeal the determination (AR 250). By letter dated January 8, 2004, plaintiff's attorney submitted an appeal, submitted some additional information regarding plaintiff's condition, and stated more information would be forthcoming (AR 264-65). On February 4, 2004, Met Life apparently received some additional medical information (AR 130).

On March 29, 2004, Met Life sent plaintiff's file for review to an outside physician named Dr. Jeffrey Lieberman, who is a rheumatologist (AR 131). In a report dated April 9, 2004, Dr. Lieberman provided his diagnosis and conclusions about plaintiff's conditions (AR 762-66). The report lists the following diagnoses: 1. FM [Fibromyalgia], 2. Depression, 3. Sleep Apnea 4. DJD [degenerative joint disease] (AR 762). The report discusses the file history of plaintiff's case, and poses the following question: "1. Does the medical documentation support functional limitations and an inability to function as of 12/21/02?" The report provides this answer:

> Based on the objective findings and above discussion, the patient has degenerative lumbar disc disease, sleep apnea, possible fibromyalgia, and significant depression/anxiety. From a medical standpoint, she should be able to perform reasonably ergonomically compensated sedentary or light duty occupation. I cannot comment specifically regarding the psychiatric issues, but cognitively she seems to be capable as well based on the FCE [functional capacity evaluation].

AR 764. The report then asks "what information is lacking?" and in answer to the question states:

> 1) There is no objective evidence of cognitive impairment.
> 2) There is no severe mechanical impairment.

3) The evidence on the FCE of symptom exaggeration is
compelling.

AR 765.

By letter dated April 15, 2004, Met Life upheld the termination of plaintiff's

benefits (AR 767-68).  This letter does not specifically incorporate the reasons for

termination contained in the July 15, 2003 letter, but does state that the original

determination was "appropriate."  AR 768.  The letter states that Met Life determined

that the documentation in the file did not support a disability that would prevent plaintiff

from working as defined in the plan (AR 768).  In support of this determination, the letter

references the April 9, 2004 report of Dr. Lieberman, referred to as an Independent

Physician Consultant, discusses his review of certain issues which are further discussed

below in this Order, and concludes that "the consultant indicated there was  no objective

evidence of cognitive impairment and there was no severe mechanical impairment."  AR

768.  The letter advises plaintiff that no further appeals will be considered (*id).*  Plaintiff

filed her complaint in this action on December 22, 2004.

## II.  STANDARD OF REVIEW

There is no dispute in this case that the disability policy gives discretion to Met

Life to determine eligibility for benefits and construe the terms of the Plan (*see* AR 37-

38).  Therefore, this Court must apply the so-called "arbitrary and capricious" standard

of review.  *Fought v. UNUM Life Ins. Co. of Am.,* 379 F.3d 997, 1003 (10th Cir. 2004).

There is also no dispute here that Met Life had a conflict of interest in that it is both the

claims administrator and the insurer.  In such situations, a less deferential standard

applies.  As articulated in *Fought*:

Under this less deferential standard, the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard. *See* Kennedy, *Judicial Standard,* 50 AM. U.L.REV. at 1174. In such instances, the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence. The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest.

379 F.3d at 1006; *see also DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F. 3d 1161, 1167 (10th Cir. 2006). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker. In other words, it is more than a scintilla, but less than a preponderance. *Rekstad v. U.S. Bancorp*, 451 F. 3d 1114, 1119-20 ( 10th Cir. 2006); *see also Leach v. Continental Casualty Co.*, 225 Fed. Appx. 729 (10th Cir. 2007).

Accordingly, the appropriate standard of review to be applied to Met Life's determination here is the "arbitrary and capricious" standard of review, as articulated in *Fought*, providing for the reduced deference as described therein due to defendant's admitted conflict of interest. According to *Fought* this is a case where "the district court is required to slide along the [arbitrary and capricious] scale considerably and an additional reduction in deference is appropriate." 379 F.3d at 1007. The burden is thus shifted "to the fiduciary to justify the reasonableness of its decision." *Id.* at 1006.

The specific decision at issue is the final determination of Met Life contained in the April 15, 2004 letter. Given that the determination depends almost entirely on Dr. Lieberman's evaluation of the file, including references to some of the findings he

made, it is the report of Dr. Lieberman that provides the most comprehensive explanation of Met Life's determination.

## III.  PLAINTIFF'S AND DEFENDANT'S POSITION

Plaintiff contends that the report of Dr. Lieberman does not provide substantial evidence to support Met Life's determination for several reasons.  She argues that Dr. Lieberman did not consider all the medical evidence in the file, given that he did not refer to every medical report, arguing that instead he "cherry picked" as to some of the medical evidence that supported the conclusion he sought to reach (Plaintiff's Brief at 19-21; Plaintiff's Reply Brief at 5-6).  Plaintiff also submits that Dr. Lieberman's report does not provide reasonable support for the determination because he does not give any weight to a determination of disability made by the Social Security Administration (Plaintiff's Brief at 22; Plaintiff's Reply Brief at 10-11).

Plaintiff further complains that Dr. Lieberman applied a standard requiring "objective" evidence of disability when no such standard is included in the disability policy (Plaintiff's Brief at 20, 23; Plaintiff's Reply Brief at 3-5).  Finally, although not entirely clear from the briefs, plaintiff argues that Dr. Lieberman improperly "second guessed," and then discounted, a functional capacity evaluation ("FCE") of plaintiff, prepared by Sherry Benisch, OTR, a certified work capacity evaluator, dated January 21, 2004 (Plaintiff's Brief at 17-18; Plaintiff's Reply Brief at 21-22).

Defendant correctly submits that the medical finding of fibromyalgia does not in and of itself support a finding of disability.  As stated in *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 877 (9th Cir. 2004), despite a diagnosis of

fibromyalgia, the question is whether the condition renders the person unable to work because of it.  This is discussed in more detail below.

Met Life argues that it reasonably exercised its discretion to deny plaintiff's claim because her medical evidence consisted mainly of her own subjective complaints, and that the medical evidence plaintiff submitted did not support her claim of total disability from any occupation.  Met Life further argues that it properly reviewed her claims, both internally and through Dr. Lieberman, and that Dr. Lieberman's assessment of Ms. Benisch's report as to plaintiff's functional capacity was reasonable.  It rejects plaintiff's suggestion that a Social Security determination of disability is pertinent to a disability determination under a long-term disability policy.  Finally, it asserts that it is entitled to recover $4,140.30 on its counterclaim arising from overpayment of disability benefits to plaintiff.

## IV.  ANALYSIS

### A.  The SSA Determination

Plaintiff's argument that Met Life did not give weight to the disability determination of the Social Security Administration is easily resolved.  Plaintiff cites no authority requiring a disability insurer to adhere to, or even give weight to, such a disability determination.  The law in this Circuit appears to be contrary to plaintiff's position.  *See, e.g. Meraou v. Williams Co. Long Term Disability Plan*, No. 06-5051, 2007 WL 431515, at *9 (10th Cir. 2007) ("We reject [plaintiff's] argument that her past and continued receipt of Social Security disability benefits required TWC [the Plan] to continue to pay benefits under the Plan . . .").

The case cited by plaintiff in support of her argument, *Ladd v. ITT Corp.*, 148 F.3d 753 (9th Cir. 1998), rested on the assumption that the Social Security definition of disability and the definition of disability in the plan at issue there were the same, and suggested that the fact the insurer there supported the plaintiff's disability application before the SSA was in the "spirit" of a judicial estoppel. *Id.* at 754, 756. However, here there has been no showing that the Met Life policy definition of disability corresponds to the definition of disability applied by the SSA. Moreover, *Ladd's* suggestion of a notion of estoppel arising from a social security decision has been generally rejected in subsequent court decisions even outside the Tenth Circuit. *See, e.g., Wical v. Intern. Paper Long-Term Disability Plan,* 191 Fed. Appx. 360, 369-71 (6th Cir. 2006); *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 294-95 (6th Cir. 2005); *Wise v. Hartford Life and Accident Ins. Co.*, 360 F. Supp. 2d 1310, 1314-15 (N.D. Ga. 2005); *Cossio v. Life Ins. Co. of North America*, 240 F. Supp. 2d 388, 394-95 (D. Md. 2002).

Furthermore, in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833-34 (2003), the Supreme Court indicated that since the validity of a claim to benefits under an ERISA plan is likely to turn, in large part, on the interpretation of terms in the plan at issue, Social Security rules do not govern the procedures for determining claims governed by ERISA. Accordingly, I reject plaintiff's argument that Met Life erred in not giving weight to the disability determination of the Social Security Administration.

**B. The objective evidence standard**

Plaintiff also argues that Met Life's requirement of objective evidence was unreasonable. She asserts that the Tenth Circuit has held that objective findings are not required to prove a claim of disability based on conditions such as fibromyalgia. I

find that this issue turns on whether the administrator requires objective evidence of the disability, *i.e.*, the claimant's functional capacity, or whether the administrator requires objective findings with respect to the condition itself.

I first address whether Met Life could reasonably require objective evidence of plaintiff's disability. I find no error with this requirement. The Plan itself expressly requires proof of disability "satisfactory" to Met Life, although this does not specify whether or not objective evidence is required. I find that interpreting "satisfactory" proof to mean objective evidence of the disability is not an unreasonable interpretation of the term of the language of the Plan. Indeed, there is ample authority that it is reasonable for an administrator to require objective evidence that conditions such as fibromyalgia disable the claimant from working, *i.e.*, that the claimant's functional capacity prevents her from working. *See Huffaker v. Metropolitan Life Ins. Co.*, No. 07-5410, 2008 WL 822262, at *5-6 (8th Cir. 2008); *Rose v. Hartford Fin. Servs. Group, Inc.*, No. 07-5423, 2008 WL 648965, at *8-9 (6th Cir. 2008); *Jordan*, 370 F.3d at 877. I discuss later whether there was objective evidence in the record that the fibromyalgia was disabling.

I next address whether it is reasonable for a plan administrator to require objective findings that support the existence of the condition itself. I note that Met Life appeared to base its denial of benefits on the fact that there were no such objective findings. Specifically, in Met Life's July 15, 2003, denial letter, Met Life stated as a basis for denial of the claim that "[t]he information received from Dr Weiss and Dr. Grosser does not . . . provide any objective findings on physical exams . . . ." (AR 251). It is unclear what Met Life meant from this statement. To the extent that Met Life was requiring objective findings from the physical exams such as joint swelling, muscle

strength, sensory functions, reflexes or other such evidence, this was unreasonable and would be arbitrary and capricious.

As noted by the Tenth Circuit:

Patients with FMS [fibromyalgia) syndrome] usually look healthy. Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling, although there may be tenderness on palpation. In addition, muscle strength, sensory functions, and reflexes are normal despite the patient's complaints of acral numbness.

*Moore v. Barnhart*, 114 Fed. Appx. 983, 991-92 (10th Cir. 2004). In other words, fibromyalgia is not capable of being diagnosed through such objective findings. Instead, it is instead "diagnosed entirely on the basis of patients' reports and other symptoms." *Id.* at 990. Indeed, the Tenth Circuit has indicated that "'[b]ecause proving the disease is difficult, fibromyalgia presents a conundrum for insurers and courts evaluating disability claims.'" *Welch v. UNUM Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) (quotation omitted).

While *Moore* was not an ERISA case, there is ample authority that supports its holding in the ERISA context. In other words, it is unreasonable for a plan administrator to require objective medical findings such as those discussed above to prove the existence of the condition of fibromyalgia. *See Jordan*, 370 F.3d at 877 ("[f]ibromyalgia is a medical label that, as Jordan recognizes, cannot be objectively proved. . . . Thus if the administrator had said, 'we will not accept fibromyalgia as a diagnosis unless you present objective evidence of it such as positive findings on x-rays,' she would have been demanding what cannot exist, which is what Jordan claims she did") (quotation omitted); *Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 21 (1st Cir. 2003) ("[g]iven the nature of Cook's disease, it was not reasonable for Liberty to expect her to

provide convincing 'clinical objective' evidence that she was suffering from CFS" and fibromyalgia).

Indeed, cases clearly distinguish between the requirement of objective evidence of a disability as compared to objective evidence of a condition such as fibromyalgia and chronic fatigue syndrome. Requiring objective evidence of the disability is reasonable but requiring objective findings related to the existence of those conditions is not. *See Rose*, 2008 WL 648965, at *9 ("While it would have been unreasonable for Continental to request objective evidence of fibromyalgia and chronic fatigue syndrome-conditions that are diagnosed through an evaluation of an individual's subjective complaints of pain-Continental did not require such evidence. Rather, Continental based its decision on the lack of objective evidence of the effect Rose's conditions had on her functional capacity); *see also Pralutsky v. Metropolitan Life Ins. Co.*, 435 F.3d 833, 839 (8th Cir. 2006).[5]

---

[5] I note that there is a Tenth Circuit case that appears at first blush to support Met Life's argument. *See Meraou v. Williams Co. Long Term Disability Plan*, 2007 WL 431515 (10th Cir. 2007). However, I find that case to be distinguishable. In *Meraou*, the Tenth Circuit noted that "[f]or the most part the consultants did not state that Ms. Meraou needed objective evidence to document the *existence* of her medical conditions, already diagnosed by her doctors. Objective evidence, in their opinion, was necessary primarily to confirm the *disabling severity* of these conditions. *Id.* at *6 (emphasis in original). This was true as to the fibromyalgia diagnosis. Indeed, the Tenth Circuit acknowledged an argument that disability from fibromyalgia cannot be rejected simply because it involves only subjective symptoms, since that would mean that fibromyalgia could never be disabling. *Id.* at *7. Instead, the Tenth Circuit held that the denial of disability was permissible as to fibromyalgia "when the allegedly *disabling* condition has been established only by the claimant's subjective complaints." *Id.* at *8 (emphasis added). *Meraou* concluded that the plaintiff "fails to show that the Committee's decision, stated on her failure to submit recent, comprehensive medical evidence *sufficient to establish the disabling nature of her fibromyalgia*, was arbitrary and capricious. *Id.* at *8 (emphasis added). As noted previously, the requirement of that type of objective evidence by the plan administrator is reasonable and is not arbitrary. The Tenth Circuit also noted, however, that in some instances the consultants in that case concluded that "the diagnoses of particular ailments were unreliable because they were based on subjective reporting or were unsupported by available objective testing or other data." *Id.* at 7. It found that even a reliance on that reasoning was not improper give the language of the plan which required "conclusive medical evidence" that the claimant could not work. It further found that plaintiff failed to show that the administrator erred in construing this definition to require recent, objective evidence of the existence of the condition, particularly when the

-13-

Based on the foregoing, Met Life's argument in its brief that its decision to deny plaintiff's claim and reject the opinions of the treating physicians was reasonable as the opinions were based primarily on plaintiff's own subjective complaints must be rejected. Further, I note as to this argument that a medical doctors's statements about Plaintiff's condition or impairments "are specific medical findings" which cannot be rejected without conflicting evidence, even though these findings are based on subjective complaints of the plaintiff. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

I also note that the type of objective evidence in the record that does support a diagnosis of fibromyalgia was actually present in the record. I find that this also may not have been properly analyzed by Met Life. As Met Life's letter of April 15, 2004, recognized, Dr. Weiss found that Plaintiff had 15 of 16 trigger points. (AR 768). Met Life went on to state in that letter that the consultant noted that fibromyalgia patients have 18 trigger points. (*Id.*) It is unclear whether Met Life used the consultant's finding as a basis to reject Dr. Weiss's findings. However, fibromyalgia is diagnosed more or less objectively through trigger points—in order to have fibromyalgia a patient must have 11 of 18 identified trigger points. See *Moore*, 114 Fed. Appx. at 991; *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003); *see also Meraou*, 2007 WL 431515, at *8; *Hidalgo v. Comcast Comprehensive Health and Welfare Plan*, No. 06-cv-01009-WYD-MJW, 2007 WL 2889707, at *7-8 (D. Colo. 2007).

---

consultants said that such evidence should have been provided. *Id.* at *7. That discussion, however, related to depression, not fibromyalgia. Further, the plan at issue does not contain the "conclusive medical evidence" standard.

Certainly the finding by Dr. Weiss of 15 trigger points would satisfy such a requirement. Further, Dr. Lieberman agreed that the "objective findings" supported a diagnosis of fibromyalgia (AR 764).[6] This was not discussed or recognized by Met Life in its subsequent denial letter in April 2004. Further, it is impossible to determine whether Met Life's statement in its final denial letter that "the original claim determination was appropriate" relied on the same reasons for denial of the claim discussed in the July 2003 letter, including the fact that Plaintiff did not present objective medical findings from physical exams that demonstrated fibromyalgia.

Based on these errors which I find to be unreasonable, I must consider the remedy. One remedy is to overturn the administrator's decision as arbitrary and unsupported by the evidence since all of it has not been considered, and award benefits. But, I do not find that is the appropriate result here, as all the evidence has not been considered and the administrator did not explain adequately the grounds for its decision. Rather, I find the appropriate remedy is to remand the case back to the claims administrator to make appropriate findings on the issue of objective medical evidence, as discussed in this Order. *See DeGrado*, 451 F.3d at 1175-76*; Rekstad v. U.S. Bancorp,* 451 F.3d 1115, 1121 (10th Cir. 2006).

## C. Other Medical Evidence

Plaintiff also submits that Met Life's determination as reflected in the Lieberman evaluation is not supported by the record as a whole because it cites to some medical

---

[6] The area where he found a lack of objective evidence was with respect to plaintiff's "cognitive impairment" (AR 765). In this regard he stated only that he "cannot comment specifically regarding psychiatric issues, but cognitively she seems to be capable as well based on the FCE." (AR 764). This finding is addressed below.

evidence but ignores other medical evidence of disability submitted by plaintiff, with little or no indication that such other medical evidence was considered. Specifically, plaintiff argues that Met Life ignored medical evidence of plaintiff's physical disability submitted by her treating physicians Drs. Weiss, Grosser, Kassan, Westermann, opinions by Drs. Bennett and Gantz, and a mental evaluation by a psychologist named Dr. Peterson (Plaintiff's Brief at 14-17). As defendant correctly points out, in an ERISA case, unlike a Social Security disability case, there is no special weight to be given to the opinions of treating physicians. *Nord*, 538 U.S. at 834. Nonetheless, if the record is replete with medical evidence of disability that is not considered by the claims administrator, its determination becomes suspect. Accordingly, I consider the medical evidence cited by plaintiff and Met Life's evaluation of such evidence.

During 2003, the relevant period during which plaintiff was claiming disability, she was seen twice by Dr. Weiss. The medical report of a visit on March 31, 2003 (AR 340), reflects some limited range of motion, but the rest of the exam was negative. The note of a follow up visit on October 6, 2003 (AR 339) describes plaintiff's condition as overall "the same" although not sleeping as well, and reports that her upper extremity joints were normal, neck range of motion was not assessed, lower extremity joints "were okay," and lumbar range of motion revealed diminished left side bending (*id.*). On October 6, 2003, the same date as the latter examination, Dr. Weiss provided plaintiff with a letter "to whom it may concern" opining that plaintiff suffered from fibromyalgia and chronic pain, and was therefore "incapable of gainful employment despite treatment because of her chronic pain, chronic fatigue, and cognitive problems." AR 338. Dr. Weiss opined that she did not expect plaintiff "to be able to go back to work ever." *Id.*

Dr. Lieberman's evaluation indicates that he reviewed Dr. Weiss's medical notes, but he did not expressly address the October 6, 2003 opinion letter. Nonetheless, given the lack of medical findings regarding functional limitations that impact disability in the office note of the same day, it would be reasonable for the claims administrator not to give weight to that opinion letter.

Plaintiff also submits that a letter from Dr. Grosser dated February 20, 2004, addressed "to whom it may concern," supports her disability claim as it states plaintiff's "medical conditions are permanent and cause disability to the point she is unable to work." AR 597. Again, Dr. Lieberman's evaluation does not address this specific letter from Dr. Grosser, although it does reference other information provided by him.

I note, however, that Dr. Grosser first saw plaintiff in January 2003, and his notes of that examination describe plaintiff as a "well-nourished, well-developed female" with muscle tenderness in her back and arms and swelling in the extremities (AR 393). He recommended continuing with her regular medications as well as "regular exercise" and participation in exercise classes (*id*). He noted in a letter dated April 1, 2003, that Plaintiff has "L5-S1 facet arthropathy bilaterally, and tremors" and "due to the fibromyalgia syndrome involving ocular muscles, she has diplopia" and has "difficulties with memory and concentration." (AR 577). "These episodes occur daily and they interfere with her ADLs, as well as gainful employment." (*Id*.)[7]

---

[7] Dr. Lieberman rejected the findings of diplopia, stating that this finding "illustrates a lack of understanding of fibromyalgia" which "does not affect specific muscles such as ocular muscles in this way and has never been associated as an actual cause of diplopia." (AR 765).

Dr. Grosser also saw plaintiff on May 14, 2003 and noted in a physical capacity evaluation ("PCE") that she could sit for three hours, stand for two hours, and walk for three hours out of an 8 hour work day (AR 572). He noted that her pain increased after three hours, and she would have to rest for about 45 minutes before she could alternate positions (*id.*). The May 2003 PCE also indicated that plaintiff could lift and carry up to 5 pounds frequently, lift 5 to 20 pounds occasionally, but never carry more than 5 pounds (AR 573). The evaluation also noted that plaintiff had limitations with "concentration and focus" (AR 574).

Notes from a follow-up examination by Dr. Grosser on December 29, 2003 (AR 403) report that plaintiff stated that she has "episodes" in which she is "essentially dysfunction[al] due to pain and depression" and that she has "periods of time" in which she feels very weak. His objective examination on that date notes that plaintiff had "multiple trigger points all up and down the spine particularly in the low back at the level of L5-S1; also L4-5", good range of motion overall but plaintiff felt a "generalized stiffness throughout much of her body." (*Id.*) He noted that her pain medication has been "somewhat successful" but diagnosed chronic pain and "chronic pain med management" as well as fibromyalgia and depression. (*Id.*)

I do not read Dr. Grosser's actual findings in 2003 as necessarily supportive of a medical condition through 2003 that is permanently disabling. Although plaintiff clearly had some limitations, the findings do not necessarily preclude all work. Given these medical findings, it is unclear as to the basis for the February 2004 opinion given by Dr. Grosser, who apparently had not seen plaintiff during the intervening period since December 2003. Accordingly, I cannot say the report Dr. Grosser dated February 20,

2004 should have been relied on to find disability.  I do note, however, that Dr Grosser's PCE and other findings may be relevant to the extent they support subsequent functional and/or work capacity evaluations which may support a finding of disability.  I address those evaluations below.

Dr. Grosser apparently referred plaintiff to Dr. Stuart Kassan who examined her on or before November 20, 2003 (*see* AR 410-11).  Dr. Kassan noted her condition as "probable fibromyalgia," which plaintiff told him was possibly caused after receiving a "birth control shot."  AR 410.  This diagnosis was supported, apparently, by his finding that she had multiple tender points in her spine, hips and knees (AR 411).  While he concluded that she had a "fibromyalgia-type syndrome" he did not set forth any opinion as to her ability to function, but stated that he reserved his opinion "pending lab and x-ray studies."  *Id.*

In a note describing a follow up visit on December 9, 2003, Dr, Kassan states that plaintiff reported she was "doing about the same."  He further noted that the lab tests returned on December 3, 2003 are either normal or unremarkable, that her rheumatoid factor is negative, her neurologic exam is unremarkable and the X-rays and bone density tests were still pending (*id.).*  His prognosis concludes that "it seems the patient indeed has a fibromyalgia/chronic pain syndrome" with "marked symptomalogy."  He notes that plaintiff "managed early on the above-mentioned medications" and recommends continuing medications as noted (AR 407).  Then he adds an "Addendum" stating: "At this point, also I feel the patient is totally disabled, as well."  *Id.* (emphasis in original).

Dr. Lieberman did not disregard Dr. Kassan's opinion but rather commented that Dr. Kassan gave no explanation as to why plaintiff was disabled, or what her disability

features were (AR 763).  I cannot disagree with Dr. Lieberman's observation, as there is no discussion in Dr. Kassan's December 9, 2003 report as to the basis for his addendum.

On November 21, 2003, plaintiff, again apparently referred by Dr. Grosser, saw Dr. Westerman for a third rheumatologic opinion (AR 408-09).  She saw him only on this one occasion.  He noted that she had been diagnosed with fibromyalgia and stated that the plaintiff said the onset was "slow" and not related to an accident (AR 408), somewhat of a discrepancy to what was reported by Dr. Kassan.  He notes that plaintiff reported she had "progressive pain, fatigue, and profound cognitive dysfunction which has been so severe that she actually lost her job."  *Id.*   In his examination Dr. Westerman noted that the classic fibromyalgia trigger points were elicited, and he observed no signs of malingering (AR 409).  He concluded that plaintiff has a severe case of fibromyalgia and he believed she is totally disabled, stating that he concurs with Drs. Weiss and Kassan "in this regard."  *Id.*

Again, Dr. Lieberman did not disregard Dr. Westerman's opinion, but commented that there was no objective data to support the conclusion that she had "profound cognitive dysfunction" and he opined that the examination seemed "perfunctory in its depth."  AR 763.  He also noted that neither Drs. Westerman or Dr. Kassan stated that they would change the care of the plaintiff, nor did they recommend a regime of exercise, low-impact aerobics or an aquatic program, all of which have been shown to be beneficial in fibromyalgia patients (*id.*).  Given the lack of objective findings of Dr. Westerman regarding functional limitations, I do not find that its opinion should necessarily have resulted in a finding favorable to plaintiff.

Plaintiff also cites to a statement from Dr. Daniel Bennett dated February 18, 2004, in which he states he reviewed the two reports from Dr. Kassan, the letter from Dr. Westerman, the clinic note from Dr. Weiss dated October 6, 2003, and a questionnaire dated November 21, 2003 (AR 592). Although Dr. Bennett had seen plaintiff at an earlier time, he apparently did not perform a physical examination in February 2004. Based on his review of the documentary file, he states that he is "in substantial agreement with these treating sources that the restrictions and limitations as stated in the medical reports and the Social Security decision dated 7/3/03." AR 592. He does not, however, specify what restrictions or limitations he is referring to, and it is unclear what Dr. Bennett's note adds to the mix of information as to plaintiff's condition. It does not appear that Dr. Lieberman reviewed the note from Dr. Bennett, as it is not referenced in his evaluation.

Plaintiff also cites to a letter dated February 23, 2004 from Dr. Nelson Gantz, an infectious disease specialist at the Boulder Community Hospital and apparently a specialist in chronic fatigue syndrome (AR 594-95). Dr Gantz, like Dr. Bennett, appears to have written his opinion letter without seeing the plaintiff and based solely on his review of some records. He opines that plaintiff is "disabled and unable to return to her job in computer security" and he believes "she will be disabled for at least a period of one year or more." AR 594. As noted above, however, the issue at this juncture is not whether plaintiff could return to her former position, but whether she was disabled from "any occupation." The Gantz opinion is also not mentioned in Dr. Lieberman's evaluation, but it does not address plaintiff's ability to work in any occupation and provides no supporting facts.

As generally indicated above, given the lack of consistent medical findings to support the opinions set forth by these various doctors' reports, and the lack of specificity as to the physical limitations faced by plaintiff, I cannot find that Met Life's determination that plaintiff has failed to show she is disabled, in light of these reports alone, is unreasonable or unsupported. However, I do find that these reports cannot be summarily rejected to the extent that they support the functional/work capacity evaluations of Ms. Benisch and Dr. Peterson, which I find below were not properly evaluated. These evaluations provide objective medical evidence of Plaintiff's disability. To the extent that Plaintiff's treating physicians' opinions support these evaluations, I find that they must be properly considered on remand. *See Nord*, 538 U.S. at 834 (a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician).

### D. The evaluation of the FCE and evidence of cognitive impairment

Plaintiff's argument regarding Dr. Lieberman's review and consideration of the FCE administered by Sherry Benisch raises substantial questions. The administrative record reflects that Ms. Benisch, a licensed occupational therapist, performed a functional capacity evaluation of plaintiff in January 2004 at the request of plaintiff's counsel for the purpose of providing "him with information regarding Ms. Buzby's ability to perform work." (AR 355). Ms. Benisch's written report contains the following notation:

> Ms Buzby initially produced a questionably valid test. There were some nconsistencies noted in force readings. She was asked to return and repeat testing due to these findings and on the second testing procedure she produced a valid FCE. That is to say, she was consistent in producing very similar force readings between multiple trials. Her abilities between the above outline inter-related tests were consistent. Close observations of behaviors were consistent throughout all the tests. Based on widely accepted protocols

for evaluating consistency of effort in this field of expertise, I can say that Ms. Buzby was putting forth full effort.

(AR 358). It is unclear to me whether the report from Ms. Benisch contained in the administrative record (AR 355-372) includes results from the first test, as well as the second test, or only the later test.

In any event, plaintiff references certain findings in that report as supportive of her claim that she is disabled (plaintiff's Brief at 15). Although not expressly cited in plaintiff's Brief, I note that Ms. Benisch's report contains the following findings: plaintiff's ability to remain functional during the FCE lasted only 3 hours and 15 minutes; that the longest period she could sit was 40 minutes, but as pain levels and fatigue rose, her sitting tolerance was only 10 minutes; that her standing tolerance was only 25 minutes; she needed to change positions so often it was almost difficult to track each change of position; and it would not be possible to know her tolerance for sitting or standing from hour to hour (AR 359).

The report also notes that bending activities were difficult for plaintiff, because of the pain in her hips and knees she was forced to bend to reach lower items (as in files in a file cabinet), which in turn caused fatigue to accelerate and caused her to become flushed and needing to sit down (*id.*). The report further comments that in addition to the inability to perform prolonged sitting or standing, plaintiff requires frequent breaks to perform pain management techniques such as lying down, stretching, and applying thermal modalities such as heat for her neck and ice for her head and eyes throughout the day (AR 360). Due to these needs, Ms. Benisch opined that there is no employment situation that would allow this type of behavior during work hours (*id.*).

The report also states that plaintiff's cognitive activities were evaluated, and notes that plaintiff "performed well cognitively when neck flexion was not a component of the activity" but when a paper task performed on a desk required her to flex her neck to look down, her neck and head pain increased (AR 360). The report does not expressly state whether the increased pain during neck flexion interfered with plaintiff's cognitive abilities although that is the apparent implication of the comments.

Finally, the report states that it attempts to compare plaintiff's abilities with the physical requirements of various sedentary jobs, such as a receptionist, laundry attendant or telemarketer, since such positions may be used to determine whether or not plaintiff could perform consistent sedentary work (AR 359). The report concludes that given plaintiff's "functional limitations including physical abilities, fatigue levels, or cognitive deterioration over time there are no jobs that are compatible with her abilities. Her abilities are not consistent with the demands of those jobs listed previously or the demands of [her] previously held job as a security specialist." (AR 360).

As noted above, the report contains a notation that plaintiff "initially produced a questionable valid test" (AR 358) but later states "in summary, Ms. Buzby participated fully in this functional capacity evaluation to the best of her ability." AR 360. The report sets forth the reasons for this conclusion, and concludes that Ms. Benisch was able to accept plaintiff's demonstrated performance as her maximum physical abilities (AR 361).

Dr. Lieberman's evaluation at the outset notes the issue of the validity of plaintiff's FCE, and indicates that he contacted Ms. Benisch via telephone to discuss the report (AR 762). His evaluation indicates that in the conversation Ms. Benisch described what he reported as "many inconsistencies" in the FCE test and he commented that "validity tests"

are vital to determine evidence of "effort and malingering." AR 764. He further states that in his opinion "and that of an Atlanta FCE Administrator with whom I spoke today, this invalidates the test because of the learning curve that is developed for the coefficient variations." *Id*. Dr. Lieberman further comments, apparently referring to his telephone call with Ms. Benisch, that she said she felt that plaintiff self-limited her abilities in order to show that she "could not do as much as she is capable of." AR 764.

Based on his review and outside research, Dr. Lieberman concluded that evidence on the FCE of "symptom exaggeration is compelling." AR 765. Accordingly, in his review of April 9, 2004, he appears to have given little or no weight to the substantive results of the FCE performed by Ms. Benisch, and with the exception of his comment about her cognitive performance as discussed below, he does not discuss the data presented in the FCE. I find this is significant since a functional capacity evaluation can provide objective proof of disability, as required by Met Life. *See Huffaker*, 2008 WL 822262, at *6. It is particularly significant in this case since the FCE was arguably the best objective evidence of disability that existed in the record.

I find that Dr. Lieberman's rejection of the FCE is unreasonable for several reasons. First, Dr. Lieberman is not shown to have any expertise with respect to functional capacity evaluations, which are occupational assessments typically performed by occupational therapists. As such, it was improper for him to have rendered a personal opinion that the re-testing by Ms. Benisch was improper. Further, to the extent that he relied on the opinion of the Atlanta FCE Administrator, I also find that this was unreasonable. The Administrator was not identified and was not part of the record. Without such identification, it was impossible for plaintiff to determine whether this opinion

actually substantiated Dr. Lieberman's opinion or whether the opinion was reliable. Second, I note that Dr. Lieberman does not compare the results of this FCE with the results of the FCE conducted by Dr. Grosser to determine to what extent they are consistent. This also was unreasonable.

As to Dr. Lieberman's decision that "[t]he evidence on the FCE of symptom exaggeration is compelling", he appeared to rely not on the results of the actual FCE in the record (which did not support such a finding as discussed below) but on his subsequent telephone conversation with Ms. Benisch. As stated previously, he stated that Ms. Benisch said she felt the claimant self-limited her abilities in order that she could not do as much as she is capable of (AR 764). He also said that Ms. Benisch admitted that the re-testing may have led to less-than-valid results (*Id.*)

By letter dated May 11, 2004, plaintiff's counsel responded to Dr. Lieberman's evaluation and forwarded to Met Life a letter issued by Ms. Benisch dated May 7, 2004 (AR 775-777). Ms. Benisch's letter sets forth in detail what she recalls explaining to Dr. Lieberman in their telephone call. She indicates that they discussed the possibility of a "learning curve" affecting the validity of the second test, but states that while a person may perform faster on a second test, repeating a test does not "affect consistency of effort." AR 776-77. She also states that she explained to Dr. Lieberman that since patients are not typically given a second chance to test, she is not aware of literature that addresses the "reliability of validity testing on a repeat basis." AR 777. The letter does not expressly deny Dr. Lieberman's statement that Ms. Benisch told him plaintiff self-limited her abilities, but it does say that she believes the validity scores were excellent during the second FCE (AR 776) and it was her professional opinion that plaintiff "was

putting forth full effort during the second FCE." AR 777. I also note that the FCE report itself has a section titled "consistency of effort" which describes methods employed to determine the subject's consistency (AR 364-65). The apparently contemporary notation by Ms. Benisch states that she believed plaintiff "was putting forth full effort during the FCE." AR 365.

The FCE report also contains a section titled "symptom exaggeration" which applies techniques in an attempt to determine if there is clinical behavior indicating that the demonstrated disability is "out of proportion" to the known medical condition (AR 366-368). Under this section Ms. Benisch noted that there is a "non-physiological factor" to plaintiff's pain presentation, as her pain syndrome has a "psych-emotional impact on her." AR 367. The report concludes that '[e]ven with the intense focus on her disability however, Ms. Buzby was able to put forth full effort with encouragement and support." AR 367-68. In essence, these two sections, completed as they are contemporaneously with the FCE, and Ms. Benisch's follow up letter of May 7, 2004, certainly demonstrate that Ms. Benisch believed the tests results reflected in the FCE were valid.

The administrative record does not indicate that Ms. Benisch's letter of May 7, 2004 was sent to Dr. Lieberman for his consideration on the issue of the validity of the FCE. The final entry in the administrative record is a June 11, 2004 letter from Met Life to plaintiff's counsel acknowledging receipt of the May 11, 2004 letter with the enclosure from Ms. Benisch, but stating that review was completed on April 14, 2004 and that such determination "constituted completion of the full and fair review." AR 784. It thus appears that Met Life did not further consider its determination after receipt of the May 11, 2004 letter and Ms. Benisch's input on the issue of the validity of the FCE.

The question is whether Met Life's failure to consider the last letter may be considered by me as a factor that undermines the record support for its final determination. Plaintiff points to no provision in the disability policy, or in the ERISA statute, that delineates how many opportunities a claimant has to demonstrate proof of disability, nor do I find any such provision in the plan or the statute that provides for the submission of additional information after an appeal is denied.

However, in *Timm v. Prudential Insurance Co. of America*, No. 05-cv-02378-MSK-BNB, 2007 WL 2669134 (D. Colo. 2007), Judge Krieger of this district faced a similar situation and considered a post-determination submission from a treating physician which, as in the case at bar, was submitted to clarify a prior opinion from that treating physician and rebut the insurer's claim denial. Judge Krieger noted that although this rebuttal was submitted after the disposition of the claimant's final appeal, the disability insurer "expressly agreed to consider it." *Id.*, 2007 WL 2669134 at *9. She found that the supplemental submission alleviated objections raised by the insurer's reviewing physician to the treating physician's earlier submitted report which supported a finding of disability. She therefore concluded, that with such objections clarified by the supplemental submission, the reviewing physician's concerns were put to rest, and on such a record, the insurer failed to show that its decision was supported by substantial evidence. *Id.* at *11.

Here, there is no indication that Met Life expressly agreed to consider the final letter from plaintiff's counsel or the enclosed letter from Ms. Benisch. The April 15, 2004 notice of claim denial to plaintiff references the Benisch FCE, but does not invite any further input from the claimant (AR 767-68). Moreover, upon receipt of the May 11, 2008

letter, Met Life did not respond that it was considering the enclosed material, but it did acknowledge receipt of the material (AR 784). Nonetheless, as in the *Timm* case, the final letter from Ms. Benisch provides information that would clarify uncertainty on the part of Dr. Lieberman as to the validity of the substantive findings in the FCE. Since he did not consider or discuss those substantive findings because he found the FCE to be invalid, the basis for the determination by Met Life, depending as it does on Dr. Lieberman's review, is called into question if the FCE is deemed valid. Further, since Dr. Lieberman went outside the record in terms of his call to Ms. Benisch to find reasons to reject the FCE and since his report was rendered after the deadline given to plaintiff to provide information in support of her claim, it seems only fair and reasonable that Met Life should have allowed and should now consider plaintiff's response to such reports, including the final letter from Ms. Benisch. Indeed, the failure to consider that letter seems unreasonable given the above facts.

In addition, as I noted above, Dr. Lieberman found based on the FCE that plaintiff was cognitively capable (AR 764). But, as Ms. Benisch noted, the FCE indicated cognitive impairment when plaintiff is required to flex her neck downward (AR 777). Moreover, as plaintiff points out, the record contains other evidence of cognitive impairment. A work capacity evaluation performed on January 5, 2004 by Dr. Linda Peterson, a licensed clinical psychologist, reflects that plaintiff has extreme limitations in the ability to make simple work-related decisions, in the ability to perform activities within a schedule, and the ability to sustain an ordinary routine without special supervision (AR 325-26). The evaluation form defines an "extreme limitation" as leaving no useful ability to perform in this area (AR 325). The evaluation also reflects plaintiff has marked

limitations in numerous other categories, including the ability to understand and remember instructions, ability to carry out detailed instructions, and ability to maintain attention and concentration over extended periods (AR 325). The evaluation constitutes objective evidence of significant limitations in Plaintiff's cognitive abilities, *see Huffaker*, 2008 WL 822262, at *6, and is substantiated by findings from plaintiff's other doctors. As such, I find it was unreasonable not to consider this evidence.

Dr. Lieberman's evaluation acknowledges one report by Dr. Peterson, buts fails entirely to address the work capacity evaluation described above. This was also unreasonable. Defendant's brief seeks to discount Dr. Peterson's findings and opinions as "totally irrelevant" to the asserted basis for plaintiff's disability, arguing that psychological problems have not been the basis for plaintiff's claim (Defendant's Brief at 25-26). However, there is nothing in the record on which to conclude that fibromyalgia does not have a cognitive component and it is error for Met Life to make such a medical judgment.

In fact, Met Life's own consultant Dr. Lieberman suggests that "cognitive impairment" is a relevant consideration, but states that objective evidence was lacking (AR 765). Yet, he does not address the evidence set forth in the work capacity evaluation of Dr. Peterson, instead summarily concluding that there is no objective evidence of cognitive impairment. If plaintiff's fibromyalgia produces cognitive effects that reduce her functioning in an area that would prevent work, that is absolutely a factor that must be considered in determining whether she is disabled.

Finally, given the FCE which found that Plaintiff could not use fine manipulation in both hands as well as findings regarding "failed back syndrome", "Right S1 radiculopathy

and lumbar facet arthritis, lumber facet disease" and other similar findings in the record (AR 575, 559, 560), I also question Dr. Lieberman's finding that there is no severe mechanical impairment.  Indeed, Dr. Lieberman does not define what he means to be a "severe mechanical impairment" and I find that this issue was not properly developed.

In sum, Dr. Lieberman's lack of consideration of the substance of the FCE due to his concerns over the test validity, his failure to compare the results of that FCE with the FCE prepared by Dr. Grosser to determine to what extent the later FCE is substantiated, his improper decision to invalidate the re-testing of Ms. Benisch based on his opinion and that of an unidentified FCE evaluator, and his failure to consider the cognitive components of plaintiff's condition or properly assess the issue of a mechanical impairment leave me with the conclusion that a remand is also appropriate on these grounds.  All the evidence has not been fully considered, and Met Life was not entitled to rely on Dr. Lieberman's opinion to deny liability without proper consideration of all of this evidence.

## V.  CONCLUSION

For the reasons set forth above, it is

ORDERED that this matter is **REMANDED** to the claims administrator to make further findings consistent with this Order.

Dated:  July 21, 2008

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge
